# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------------X
JACQUELYN MUSIELLO and other employees
similarly situated,

                Plaintiffs,            Index No.:

        -against-

                                     **SUMMONS**

CBS CORPORATION, CBS RADIO
INC., CBS SPORTS RADIO NETWORK INC.,    **The basis of venue is**
ENTERCOM COMMUNICATIONS CORP., DAN  **Plaintiff's residence.**
TAYLOR, MARGARET MARION, ABC
CORPORATIONS "1-5" and JOHN DOES "1-10",

                Defendants.
-----------------------------------------------------------------------X
To the above named Defendants:

      **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to

serve a copy of your Answer, or, if the Complaint is not served with this Summons, to

serve a Notice of Appearance, on the Plaintiff's attorneys within 20 days after the service

of this Summons, exclusive of the day of service (or within 30 days after the service is

complete if this Summons is not personally delivered to you within the State of New

York); and in cause of your failure to appear or answer, judgment will be taken against

you by default for the relief demanded in the Complaint.

Dated: February 11, 2020
     New York, New York        THE CLANCY LAW FIRM, P.C.
                             *Attorneys for Plaintiff*

                      By:  */s/ **Donna H. Clancy**_____
                             Donna H. Clancy, Esq.
                             40 Wall Street, 61st Floor
                             New York, New York 10005
                             (212) 747-1744

1

To:     CBS Corporation
        51 W. 52nd Street
        New York, NY 10019

        CBS Radio Inc.
        345 Hudson Street,
        New York, New York 10014

        CBS Sports Radio Network Inc.
        51 W. 52nd Street
        New York, New York 10019

        Entercom Communications Corp.
        401 City Avenue, Suite 809
        Bala Cynwyd, Pennsylvania 19004

        Dan Taylor
        CBS Sports Radio Network Inc.
        51 W. 52nd Street
        New York, New York 10019

        Margaret Marion
        CBS Radio Inc.
        345 Hudson Street,
        New York, New York 10014

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------------X
JACQUELYN MUSIELLO and other employees
similarly situated,

                           Plaintiffs,           Index No.:

                 -against-

CBS CORPORATION, CBS RADIO        **VERIFIED COMPLAINT**
INC., CBS SPORTS RADIO NETWORK INC.,
ENTERCOM COMMUNICATIONS CORP., DAN    **JURY TRIAL DEMAND**
TAYLOR, MARGARET MARION, ABC
CORPORATIONS "1-5" and JOHN DOES "1-10",

                      Defendants.
-------------------------------------------------------------------X

      Plaintiff JACQUELYN MUSIELLO, by her attorneys, The Clancy Law Firm, P.C.,

complaining against Defendants CBS CORPORATION, CBS RADIO INC., CBS SPORTS

RADIO NETWORK INC., ENTERCOM COMMUNICATIONS CORP., DAN TAYLOR,

MARGARET MARION, ABC CORPORATIONS "1-5" and JOHN DOES "1-10", upon

information and belief, and at all times relevant, alleges as follows:

### INTRODUCTION

      1.    Plaintiff JACQUELYN MUSIELLO, a former Human Resources and Payroll

Specialist, and an employee of CBS Corporation, directly reporting to CBS Corporation's

Director of Human Resources ("HR"), Defendant MARGARET MARION,  files this

individual and collective action pursuant to C.P.L.R. §§ 901, 1002  for *inter alia*, sex

discrimination, sexual harassment, hostile work environment, and retaliation for her

- 1 -

complaints of violations of the civil rights of CBS employees, including herself, arising

out of rampant discriminatory practices prohibited under New York anti-discrimination

and Labor laws.

## NATURE OF THE ACTION

2.     This is an action for injunctive relief, declaratory judgment and money

damages to remedy a top down workplace culture of discriminatory practices, hostile

work environment, sexual harassment, *quid pro quo*, discrimination on the basis of sex,

unequal pay, failure to pay wages and overtime, retaliation for reporting illegal practices,

constructive discharge, and unequal terms, conditions, and privileges of Plaintiff's and

other CBS employees' employment.

3.     Plaintiff files this action to remedy violations of her and other members of

her protected class' civil rights under New York City Human Rights Law, as contained

in the Administrative Code of the City of New York, § 8-107 *et seq.* ("NYCHRL"); the New

York State Human Rights Law, as contained in New York State Executive Law, § 296 *et

seq.* ("NYSHRL") and New York Labor Law Article 6, N.Y.L.L § 190 against her employer,

Defendants CBS CORPORATION, CBS RADIO INC., CBS SPORTS RADIO NETWORK

INC., (collectively "CBS") and ENTERCOM CORPORATION CORP. (referred to herein

as "ENTERCOM").

4.     Plaintiff, a female employee contends that the terms, conditions and

privileges of the employment relationship between her and other employees of her

protected class and Defendants CBS collectively, and ENTERCOM, as a single employer,

common enterprise or joint employer and/or as owner and successor in interest, were adversely affected because of their sex and their complaints of discriminatory treatment.

5.      Plaintiff further contends that she, along with other female employees, were subjected to a hostile work environment, sexual harassment, *quid pro quo,* discrimination on the basis of sex, unwanted sexual advances, solicitations, unwelcome contact, communications, innuendos, retaliatory action, unequal pay, misclassification of employee exempt status, denial of overtime, loss of earnings, and/or personal injury, and emotional distress in violation of applicable state and city statutes.

## JURISDICTION AND VENUE

6.      A substantial part of the acts giving rise to this action were committed within the State and City of New York, and venue is properly lodged in this Court.

7.      At the time of commencement of this action, Plaintiff served a copy of the Complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York in accordance with New York City Administrative Code § 8-502(c).

8.      Plaintiff JACQUELYN MUSIELLO ("Plaintiff MUSIELLO") is a female who currently resides in the County of Bronx, State of New York.

9.      Plaintiff MUSIELLO was employed by the Defendants CBS from on or about December 10, 2012 to February 17, 2017.

## PLAINTIFF JACQUELYN MUSIELLO AND DEFENDANT MARGARET MARION'S EMPLOYMENT BY DEFENDANTS CBS

- 3 -

10.     Plaintiff MUSIELLO was an employee of Defendants CBS from approximately December 10, 2012 to February 17, 2017.

11.     In or about December 2012, Plaintiff MUSIELLO became employed as Staff Accountant in the Finance Department by Defendant CBS' wholly owned and controlled subsidiary, CBS RADIO's'/Yankee's Radio Network located at 345 Hudson Street, New York, New York.

12.     In or about April 2013, Plaintiff MUSIELLO was given the title of Payroll and Human Resources Manager Generalist and moved to the HR Department reporting to Defendant MARION and Controller, Randall Friend.

13.     At various relevant times, Defendants CBS' HR department, run by Defendant MARION, was responsible for thousands of employees but consisted of only two to four employees.

14.     During her employment as a Human Resources Manager, Plaintiff MUSIELLO was required to field employee complaints, conduct investigations and interviews, and sit in on employee meetings with her supervisor, Defendant MARION, calculate wages and commissions, handle employee complaints about denial of commissions and/or miscalculations, process, prepare and/or distribute separation packages to Defendants' employees, and identify lack of controls.

15.     Defendant CBS CORPORATION treated all its employees as part of its "CBS family" as referred to in its Human Resources (HR) policies and Code of Business Conduct.

- 4 -

16.     As an HR manager, Plaintiff MUSIELLO administered Defendants CBS's HR policies and assisted Defendant CBS RADIO employees in accordance with its parent company, Defendant CBS CORPORATION's policies and Business Code of Conduct. In this regard, Plaintiff MUSIELLO was required to intake and investigate employee complaints, including, without limitation, complaints related to a hostile work environment, sexual harassment, sex discrimination, and unequal treatment in accordance with CBS CORPORATION's policies.

17.     As a Payroll Specialist, Plaintiff MUSIELLO calculated wages, maintained employment, payroll and benefit records, met with employees to discuss internal payroll issues or complaints of miscalculation of commissions or denial of overtime that arose during their employment, counseled employees, answered their questions regarding CBS CORPORATION's pay and benefits policies and procedures, responded to applications for benefits and medical and disability leave, investigated employee complaints regarding pay and benefits, and conducted exit interviews.

18.     In the course of performing her duties, Plaintiff MUSIELLO worked more than 40 hours per week beginning in or about 2015 and continuing until her separation February 17, 2017.

19.     During her employment, despite qualifying, Plaintiff MUSIELLO was denied overtime wages.

20.     At all relevant times, Defendant MARION was the Director of HR and reported to various CBS Executive personnel, including Kevin Oldis, Senior Vice

- 5 -

President of HR for Defendant CBS CORPORATION and Mark Zulli SVP HR of CBS Radio.

21.     Because of the limited resources Defendant CBS RADIO allocated to its HR department, amongst other reasons, Defendant MARION often times ignored, buried and/or failed to properly investigate employee complaints, particularly those involving sexual harassment.

22.     In the course of Plaintiff MUSIELLO's HR designated managerial duties from 2015 through 2016, she received complaints of discrimination and wrongful termination and had knowledge of investigations, lawsuits,[1] terms of settlements, written settlement agreements, and complaints made at exit interviews where Plaintiff was present with Defendant MARION.

23.     For example, Plaintiff had firsthand knowledge of settlements with two former female employees, "GL" and "AW" for complaints of discrimination.

24.     At all relevant times, Defendant MARION made decisions affecting certain CBS employees and their employment terms and conditions based on Defendant CBS CORPORATION's policies and its executives' directives.

25.     At all relevant times, Defendant MARION administered and effectuated the policies, practices and agenda of Defendant CBS CORPORATION and its predominantly male executives.

---

[1] Marc Rayfield was transferred to run Defendant CBS RADIO in New York as the Marketing Manager after he was named as a Defendant along with Defendant CBS RADIO for claims of sex discrimination and sexual harassment in the matter of <u>Shelley Kanther v. CBS Radio, Inc. of Philadelphia</u>, 2:11-cv-07835-TON, (filed 12/23/2011).

26.     At all relevant times, Defendant MARION supervised Plaintiff MUSIELLO.

27.     At all relevant times, Defendant MARION was charged with administering Defendant CBS CORPORATION's Code of Business Conduct.

28.     At all relevant times, Defendant MARION permitted, condoned, and perpetuated the top/down gender biased corporate culture and hostile work environment of Defendant CBS CORPORATION, led by its Chairman & CEO Leslie Moonves, down to its wholly owned subsidiaries' male executives.

29.     At all relevant times, Defendant MARION, as Director of HR, provided strategic direction, and tactical decision-making input to executives, and executive coaching in all operational areas, including performance management, talent acquisition, employee relations, and employee benefits. Defendant MARION shaped policy as well as hiring and compensation strategy that adversely affected female employees.

30.     At all relevant times, Defendant MARION was employed within several businesses of CBS CORPORATION, and her duties overlapped with all aspects of media and digital media, from sales to operations, and union and non-union workforces.

31.     Defendant MARION served as a key contributor on various company-wide projects and policy initiatives that affected Defendant CBS CORPORATION's 126 radio stations.

## PARTIES

32.     CBS CORPORATION, known by some as the "Eye Network" due to its eye logo, is a leading mass media conglomerate with television, radio, online content, and publishing operations. Its portfolio is anchored by CBS Broadcasting, which operates the

- 7 -

#1 rated CBS television network, along with a group of local TV stations. CBS also owns

cable network Showtime and produces and distributes TV programming through CBS

Television Studios and CBS Television Distribution. Other operations include CBS

Interactive and book publisher Simon & Schuster.

33.     Upon information and belief, Defendant CBS CORPORATION is a foreign

corporation authorized to conduct business in the State of New York.

34.     Upon information and belief, Defendant CBS CORPORATION is a foreign

corporation organized under the laws of Delaware and is authorized to transact business

in the State of New York.

35.     Upon information and belief, Defendant CBS CORPORATION derives

substantial revenue from its mass media, commercial broadcasting, publishing and

television production nationwide.

36.     Upon information and belief, Defendant CBS CORPORATION has its

principal place of business at 51 W. 52nd Street, New York, New York.

37.     At all relevant times, Defendant CBS CORPORATION is an Employer

within the meaning of NYSHRL §292(6) because Defendant CBS CORPORATION has

four (4) or more persons in its employ and conducts business in the State and City of New

York.

38.     At all relevant times, Defendant CBS CORPORATION is an Employer

within the meaning of NYC Administrative Code §§ 8-102(5) because Defendant has four

(4) or more persons in its employ and conducts business in the State and City of New

York.

- 8 -

39.     Upon information and belief, Defendant CBS RADIO INC. (referred to herein as "CBS RADIO") is a foreign corporation authorized to conduct business in the State and City of New York.

40.     Upon information and belief, Defendant CBS RADIO is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of New York.

41.     Upon information and belief, Defendant CBS RADIO is a large-market focused, multi-platform national media company with a local footprint of 117 radio stations and digital properties in 26 radio markets, including all of the top 10 radio markets and 19 of the top 25 radio markets.

42.     Upon information and belief, Defendant CBS RADIO derives substantial revenue from its broadcasts on more than 100 stations nationwide. Defendant's flagship station is WFAN (AM).

43.     Upon information and belief, Defendant CBS RADIO has its principal place of business at 51 W. 52nd Street, New York, New York.

44.     At all relevant times, Defendant CBS RADIO is an Employer within the meaning of NYSHRL §292(6) because Defendant CBS RADIO has four (4) or more persons in its employ and conducts business in the State and City of New York.

45.     At all relevant times, Defendant CBS RADIO is an Employer within the meaning of NYC Administrative Code §§ 8-102(5) because Defendant has four (4) or more persons in its employ and conducts business in the State and City of New York.

46.     Upon information and belief, Defendant CBS SPORTS RADIO NETWORK

- 9 -

INC. (referred to herein as "CBS SPORTS RADIO") is a foreign corporation organized under the laws of Delaware authorized to conduct business in the State of New York.

47. Upon information and belief, Defendant CBS SPORTS RADIO is a foreign corporation organized under the laws of Delaware and is authorized to transact business in the State of New York.

48. Upon information and belief, Defendant CBS SPORTS RADIO derives substantial revenue from transacting business in the State of New York.

49. Upon information and belief, Defendant CBS SPORTS RADIO derives substantial revenue from its broadcasts on more than 300 stations nationwide. Defendant's flagship station is WFAN (AM).

50. At all relevant times, Defendant CBS CORPORATION is the parent company of its wholly owned subsidiaries, Defendant CBS RADIO and CBS SPORTS RADIO.

51. At all relevant times, Defendant CBS CORPORATION owned, operated and controlled Defendants CBS RADIO and CBS SPORTS RADIO.

52. At all relevant times, Defendant CBS CORPORATION derived substantial revenue from its subsidiaries.

53. On September 30, 2016, Defendant CBS CORPORATION completed certain reorganization transactions resulting in all of the entities comprising Defendant CBS CORPORATION's businesses being consolidated under Defendant CBS RADIO.[2]

---

[2] https://www.sec.gov/Archives/edgar/data/1067837/000119312517311047/d362266ddefm14a.htm#rom362266_35.

54.     On February 2, 2017, Defendant CBS CORPORATION entered into an agreement with Defendant ENTERCOM to combine Defendant CBS RADIO with Defendant ENTERCOM in a merger (the "Merger") to be effected through a Reverse Morris Trust transaction, which is expected to be tax-free to Defendant CBS, and publicly announcing the Merger. Defendant CBS intends to split-off Defendant CBS RADIO through an exchange offer, in which Defendant CBS CORPORATION stockholders may elect to exchange Defendant CBS CORPORATION shares for shares of Defendant CBS RADIO, which will then immediately be converted into shares of Defendant ENTERCOM at the time of the Merger.[3]

55.     On April 12, 2017, Defendant CBS CORPORATION filed a Definitive Proxy Statement, pursuant to Rule 14a-101, Schedule 14A with the United States Securities and Exchange Commission (referred to herein as "SEC") announcing a special meeting (the "Special Meeting") and the Merger of Defendant ENTERCOM's Delaware corporation and wholly owned subsidiary, Constitutional Merger Sub. Corp. (referred to herein as "Merger Sub") with and into Defendant CBS CORPORATION's Delaware corporation and wholly owned subsidiary, Defendant CBS RADIO, whereby the separate corporate existence of Merger Sub will cease, and Defendant CBS RADIO will continue as the surviving company and a wholly owned subsidiary of Defendant ENTERCOM.[4]

56.     Pursuant to Defendant CBS CORPORATION's Proxy Statement, prior to the Merger, Defendant CBS CORPORATION and its subsidiaries will complete a

---

[3] Id.
[4] https://www.sec.gov/Archives/edgar/data/1067837/000119312517311047/d362266ddefm14a.htm.

reorganization such that the radio business and operations of Defendant CBS CORPORATION will be held under Defendant CBS RADIO as a direct wholly owned subsidiary of Defendant CBS CORPORATION.[5]

57.     Pursuant to Defendant CBS CORPORATION's Proxy Statement, shareholders present at the Special Meeting would be asked to vote on certain compensation arrangements for Defendant ENTERCOM's named executive's offices in connection with the Merger (the "Executive Compensation Proposal"). Prior to the Special Meeting, Defendant ENTERCOM's Board of Directors unanimously approved the Merger as well as the Executive Compensation Proposal.[6]

58.     Defendant CBS CORPORATION and its subsidiaries, and in particular, Defendant CBS RADIO, were to complete an internal reorganization such that the radio business and operations of Defendant CBS CORPORATION would all be held under Defendant CBS RADIO as a direct wholly owned subsidiary of Defendant CBS CORPORATION[7].

59.     Pursuant to the Merger Agreement filed with the SEC included in the Proxy Statement, Defendant CBS CORPORATION's Chairman of the Board, President and Chief Executive Officer, Leslie Moonves would serve as a Board Member on the Board of Directors for the newly merged entity between Defendants CBS RADIO and ENTERCOM.

---

[5] Id.
[6] Id.
[7] Id.

60.     The Merger provided for a Master Separation Agreement and Transition

Agreement between Defendants CBS CORPORATION and CBS RADIO that provided

for continued services and support by Defendant CBS CORPORATION of its

subsidiary, Defendant CBS RADIO and their employees

61.     At all relevant times, Defendant CBS CORPORATION had immediate

control over its subsidiary, Defendant CBS RADIO's employees; had commonality of

hiring, firing, discipline, pay, insurance records and supervision and the right to control

the means and manner of the workers' performance through Defendant CBS

CORPORATION's own policies and procedures that governed Defendant CBS RADIO

employees.

62.     Prior to and after the Merger, the Merger Documents filed with the SEC

clearly reflect that Defendant CBS CORPORATION maintained control over Defendant

CBS RADIO and its employees.

63.     At the time of Plaintiff MUSIELLO's separation from employment on or

about February 17, 2017, Defendants CBS RADIO and CBS SPORTS RADIO were wholly

owned subsidiaries of Defendant CBS CORPORATION.

64.     Defendant CBS SPORTS RADIO is a subsidiary of Defendant CBS RADIO

which became a wholly owned subsidiary of Defendant ENTERCOM as of November 17,

2017.

65.     As of November 17, 2017, Defendants CBS RADIO and/or Defendant CBS

RADIO NETWORK operate as a wholly owned subsidiary of Defendant ENTERCOM

and conduct business in the City and State of New York.

- 13 -

66. Upon information and belief, Defendant CBS SPORTS RADIO has its principal place of business at 51 W. 52nd Street, New York, New York.

67. At all relevant times, Defendant CBS SPORTS RADIO is an Employer with the meaning of NYSHRL §292(6) because Defendant CBS SPORTS RADIO has four (4) or more persons in its employ and conducts business in the State and City of New York.

68. At all relevant times, Defendant CBS RADIO NETWORK is an Employer within the meaning of NYC Administrative Code §§ 8-102(5) because Defendant has four (4) or more persons in its employ and conducts business in the State and City of New York.

69. At all relevant times, Defendant CBS CORPORATION is a Joint Employer with CBS RADIO and CBS SPORTS RADIO of their Executives and decision-makers with respect to Defendants' human resources policies and Code of Business Conduct. As such, were dually employed by Defendant CBS RADIO and/or CBS SPORTS RADIO and Defendant CBS CORPORATION.

70. Upon information and belief, Defendant ENTERCOM COMMUNICATIONS CORP., (referred to herein as "ENTERCOM") is a foreign corporation organized under the laws of Pennsylvania authorized to conduct business in the state of New York.

71. Upon information and belief, Defendant ENTERCOM is a foreign corporation organized under the laws of Pennsylvania and is authorized to transact business in the state of New York.

72. Upon information and belief, Defendant ENTERCOM merged with

- 14 -

Defendants CBS CORPORATION and CBS RADIO effective November 17, 2017 under the name of "ENTERCOM" and is a merged entity transacting business in the City and State of New York.[8]

73.     Upon information and belief, Defendant ENTERCOM is a media and entertainment company and owner of radio stations and broadcasters that derives substantial revenue from its live, original local audio content in sports, news, music, podcasting, live events and digital in the state of New York.

74.     Effective November 17, 2017, Defendant ENTERCOM owns and operates Defendants CBS RADIO and CBS SPORTS RADIO as a sports radio network, broadcasted throughout the United States on radio station affiliates and streamlined online.

75.     Upon information and belief, Defendant ENTERCOM has its principal place of business at 401 City Avenue, Suite 809, Bala Cynwyd, Pennsylvania.

76.     At all relevant times, Defendant ENTERCOM is an Employer with the meaning of NYSHRL §292(6) because Defendant ENTERCOM has four (4) or more persons in its employ and conducts business in the State and City of New York.

77.     At all relevant times, Defendant ENTERCOM is an Employer within the meaning of NYC Administrative Code §§ 8-102(5) because Defendant has four (4) or more persons in its employ and conducts business in the State and City of New York.

78.     Upon information and belief, Defendant DAN TAYLOR (referred to herein as "TAYLOR") currently resides in the State of New York.

---

[8] http://www.sec.gov/Archives/edgar/data/1067837.

79.     At all relevant times, Defendant TAYLOR was employed as a radio host for Defendants CBS.

80.     At all relevant times, Defendant TAYLOR is a person within the meaning of the NYC Administrative Code Law § 8-102(1), and an Employer within the meaning of NYC Administrative Code §§ 8-102(5) and 8-107 and is being sued here both in his personal and official capacities.

81.     At all relevant times, Defendant TAYLOR was authorized to make decisions that affected the terms and conditions of Plaintiff MUSIELLO's employment with Defendant CBS.

82.     At all relevant times, Defendant TAYLOR supervised Plaintiff MUSIELLO during the course of her employment with Defendants CBS.

83.     Upon information and belief, Defendant MARION currently resides in the State of New York.

84.     Upon information and belief, Defendant MARION is currently employed as Regional Director of HR for Defendant ENTERCOM and was previously the Director of HR for Defendants CBS, CBS RADIO and CBS SPORTS RADIO.

85.     At all relevant times, Defendant MARION was employed by Defendants CBS.

86.     At all relevant times, Defendant MARION is a person within the meaning of the NYC Administrative Code Law § 8-102(1), and an Employer within the meaning of NYC Administrative Code §§ 8-102(5) and 8-107 and is being sued here both in her personal and official capacities.

- 16 -

87. At all relevant times, Defendant MARION was authorized to make decisions that affected the terms and conditions of Plaintiff MUSIELLO's employment with Defendants CBS.

88. At all relevant times, Defendant MARION supervised Plaintiff MUSIELLO during the course of her employment with Defendants CBS.

89. Upon information and belief, Defendants ABC CORPORATIONS "1-5" [is] a foreign corporation organized authorized to conduct business in the State of New York.

90. Upon information and belief, Defendants ABC CORPORATIONS "1-5" [is] a duly authorized domestic corporation transacting business in the State of New York.

91. Upon information and belief, Defendants ABC CORPORATIONS "1-5" derives substantial revenue from its mass media, commercial broadcasting, publishing, and television production nationwide.

92. Upon information and belief, Defendants ABC CORPORATIONS "1-5" has its principal place of business at 51 W. 52nd Street, New York, New York.

93. At all relevant times, Defendants ABC CORPORATIONS "1-5" [is] an Employer with the meaning of NYSHRL §292(6) because Defendants ABC CORPORATIONS "1-5" has four (4) or more persons in its employ and conducts business in the State and City of New York.

94. At all relevant times, Defendants ABC CORPORATIONS "1-5" [is] an Employer within the meaning of NYC Administrative Code §§ 8-102(5) because Defendant has four (4) or more persons in its employ and conducts business in the State and City of New York.

- 17 -

95.    Upon information and belief, Defendants JOHN DOES "1-10" [is] an individual residing in the State of New York.

96.    Upon information and belief, Defendants JOHN DOES "1-10" [is] an employee of the corporate Defendants.

97.    Upon information and belief, Defendants JOHN DOES "1-10" works in the New York City corporate offices of Defendants.

98.    At all relevant times, Defendants JOHN DOES "1-10" [is] an Employer with the meaning of NYSHRL §292(6) because Defendants JOHN DOES "1-10" has four (4) or more persons in its employ and conducts business in the State and City of New York.

99.    At all relevant times, Defendants JOHN DOES "1-10" [is] an Employer within the meaning of NYC Administrative Code §§ 8-102(5) because Defendants have four (4) or more persons in its employ and conducts business in the State and City of New York.

**SINGLE EMPLOYER COMMON ENTERPRISE**

100.    At all relevant times, Defendant CBS CORPORATION, by its agents, servants and/or employees owned, controlled and supervised the activities and operation of its wholly owned subsidiaries and/or merged entity in the State of New York.

101.    At relevant times, Defendant CBS CORPORATION, by its agents, servants and/or employees owned, governed, managed and approved the acts and business of its wholly owned subsidiaries, including but not limited to, Defendants CBS RADIO and CBS SPORTS RADIO, and their employees.

- 18 -

102. At all relevant times, Defendant CBS CORPORATION had a fiduciary duty and acted with authority to make resolutions and decision-making as to Defendant CBS CORPORATION's subsidiaries, including, but not limited, to Defendants CBS RADIO and CBS SPORTS RADIO, relating to their policies, procedures, and compliance with New York State and New York City laws that regulated its conduct of business in the City and State of New York.

103. At all relevant times, Defendant CBS CORPORATION promulgated, drafted and approved the HR policies, code of conduct, financial policies, and internal control policies of its subsidiaries, including, but not limited to, Defendants CBS RADIO, CBS SPORTS RADIO, and ENTERCOM.

104. At all relevant times, Defendant CBS CORPORATION monitored and enforced the compliance and effectiveness of its HR policies and approved the discipline and/or termination of Defendants CBS's employees.

105. At all relevant times, Defendant ENTERCOM owned, controlled and supervised the activities and operation of its wholly owned subsidiary and/or merged entity, Defendant CBS RADIO in the State of New York.

106. At all relevant times, Defendant ENTERCOM, by its agents, servants and/or employees owned, governed, managed and approved the acts and business of Defendants CBS RADIO and CBS SPORTS RADIO and their employees.

107. At all relevant times, Defendant ENTERCOM had a fiduciary duty and acted with authority to investigate, make resolutions and decision-making as to Defendants CBS CORPORATION's subsidiaries, including, but not limited, to

- 19 -

Defendants CBS RADIO and CBS SPORTS RADIO, their policies, procedures, and compliance with New York State and New York City laws that regulated its conduct of business in the City and State of New York.

108.    Upon information and belief, Defendant ENTERCOM promulgated, drafted and approved the HR policies, code of conduct, financial policies, and internal control policies of its subsidiaries, including, but not limited to, Defendants CBS RADIO and CBS SPORTS RADIO.

109.    Upon information and belief, Defendant ENTERCOM monitored and enforced the compliance and effectiveness of its HR policies and approved the discipline and/or termination of Defendants CBS employees.

110.    During Plaintiff MUSIELLO's employment, Defendants CBS CORPORATION and CBS RADIO integrated software through Oracle Database Management Systems and integrated internal communication and payroll systems. These systems granted Defendant CBS CORPORATION access to view, monitor and/or adjust the payroll records for Defendant CBS RADIO.

111.    At all relevant times, all employment, payroll and benefits systems were subject to approval by Defendant CBS CORPORATION's HR or Executive Financial Management. At month's end, Defendant CBS RADIO's HR and payroll department reconciled its books with Defendant CBS CORPORATION's Finance Department.

112.    At all relevant times, Plaintiff MUSIELLO's reported payroll to Controller, Randall Friend, who reported directly to Stacey Benson, Defendant CBS CORPORATION's Senior Vice President of Finance.

- 20 -

113.    At all relevant times, employees of Defendants CBS CORPORATION and CBS RADIO received compensation in the form of CBS stock awards. For example, in 2015, although Plaintiff MUSIELLO's salary was paid by Defendant CBS RADIO, she received a stock letter award in lieu of an increase in compensation for excellent performance, called a "Share the Vision Award", which was signed by Chairman and CEO of Defendant CBS CORPORATION, Leslie Moonves. **Attached as Exhibit A.**

## DEFENDANTS CBS' TOP DOWN WORKPLACE CULTURE OF GENDER BIAS AND SEX DISCRIMINATION

113.    Chairman and Chief Executive Officer of Defendant CBS CORPORATION, Leslie Moonves' reign over CBS for over twenty years as one of the most powerful media executives in America came to a screeching halt after The New Yorker published an article on July 27, 2018 detailing the accounts of six women who Moonves had professional dealings with, spanning from the nineteen-eighties to the present, alleging he sexually harassed them.[9]

114.    Ironically, prior to his fall from grace, Moonves had become a prominent voice in the #MeToo movement. Moonves helped found the Commission on Eliminating Sexual Harassment and Advancing Equality in the Workplace, which is chaired by Anita Hill.[10] At a conference Moonves stated, "I think it's important that a company's culture will not allow for this. And that's the thing that's far-reaching. There's a lot we're leaving.

---

[9] https://www.newyorker.com/magazine/2018/08/06/les-moonves-and-cbs-face-allegations-of-sexual-misconduct?verso=true

[10] *Id.*

There's a lot we didn't know. But Moonves' private actions belie his public statements."[11]

(*Emphasis added*).

115.    In September 2018, Leslie Moonves, former Chief Executive Officer of Defendant CBS CORPORATION was forced to resign after multiple women came forward accusing him of sexual misconduct. Several female employees described forcible touching or kissing during business meetings, and alleged Moonves physically intimidated them or threatened to derail their careers.[12] The consensus among the women was that Moonves became cold or hostile after they rejected his advances, and that they believed their careers suffered as a direct result.[13]

116.    The New York Times article published December 4, 2018, titled, "Les Moonves Obstructed Investigation into Misconduct Claims, Report Says" reported Moonves destroyed evidence and misled investigators in an attempt to preserve his reputation and save his lucrative $120 million severance deal from employer CBS.[14]

117.    Thereafter, Defendant CBS CORPORATION hired law firms, Deveboise & Plimpton and Covington & Burling to conduct an independent investigation to determine if Moonves violated the terms of his employment agreement and thus enable the company to terminate Moonves for cause and withhold his severance.[15]

---

[11] *Id*.

[12] *Id*.

[13] *Id*. According to the New Yorkers Ronan Farrow's article, there were other instances of Moonves forcing himself on women and retaliating against them professionally when they refused to engage in any sexual contact with him.

[14] https://www.nytimes.com/2018/12/04/business/media/les-moonves-cbs-report.html

[15] Id.

118.    These independent reports generated by the firms and distributed to Defendant CBS CORPORATION's Board of Directors documented Moonves, "engaged in multiple acts of serious non-consensual sexual misconduct in and outside of the workplace, both before and after he came to CBS in 1995."[16]  The attorneys who spoke with Moonves during their inquiry on four separate occasions found him to be "evasive and untruthful at times and to have deliberately lied about and minimized the extent of his sexual misconduct."[17]

119.    During the investigations, attorneys across both firms interviewed 11 of the 17 women who they knew had accused Moonves of misconduct or harassment and found their accounts to be credible.[18]

120.    Attorneys uncovered Moonves "received oral sex from at least four Defendant CBS employees under circumstances that sound transactional and improper to the extent that there was no hint of any relationship, romance, or reciprocity (especially given what we know about his history of more or less forced oral sex with women with whom he has no ongoing relationship.)"[19] The attorneys determined that "such a pattern arguably constitutes willful misfeasance and violation of the company's sexual harassment policy." (Emphasis added).

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

121.    Investigators received "multiple reports"[20] about a network employee who was "on call"[21] to perform oral sex on Moonves. Several employees were aware of this and believed that the woman was protected from discipline or termination as a result of it. Attorneys wrote in the report, "Moonves admitted to receiving oral sex from the woman, his subordinate, in his office, but described it as consensual."[22]

122.    The independent report concluded, "[b]ased on the facts developed to date, we believe that the board would have multiple bases upon which to conclude that the company was entitled to terminate Moonves for cause."[23]

123.    However, this toxic pattern and practice of sexual harassment and discrimination was not limited to Moonves. Defendants CBS CORPORATION harbored a top down culture where male executives and managers were free to violate the sexual harassment policies and Code of Business Conduct without consequence, remediation, or retribution.

124.    CBS's top down sexist culture was blatantly hostile to women and fostered and condoned a sexually denigrating work environment for its female employees for more than a decade.

125.    Defendant CBS CORPORATION, by its CEO on down, created, allowed and condoned, a "Mad Men," "Animal House," and "Anything Goes" sexist culture to exist in their workplace resulting in flagrant sexual harassment, gender bias, unequal pay,

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

- 24 -

targeting and retaliation against complainants, while male executives, sports, radio, and TV talent and managers were afforded protection and concealment of their misconduct.

126.    Defendants CBS employees compensated its female employees significantly less compared to its male employees at nearly every level of the corporate hierarchy.

127.    Defendants CBS's hostile and gender biased work environment based on sex directly interfered with Plaintiff MUSIELLO's ability to perform her job duties as a Human Resources Manager. In particular, it interfered with her ability to protect female employees, including herself, from blatant violations of CBS' Code of Business Conduct and anti-discrimination policies. This environment subjected Plaintiff and other female employees to both physical and psychological injuries and the loss of their good name, reputation and employment opportunity.[24]

128.    At all relevant times, Defendant CBS's complaint procedure touted that "CBS strongly urges the reporting of all incidents of discrimination, harassment or retaliation regardless of the offenders' identity or position so that rapid and constructive action can be taken."

129.    The CBS Policy Guide specifically instructs employees on how to report an incident of harassment, discrimination or retaliation up the chain to Defendant CBS CORPORATION's Chief Human Resources Officer:

> "Individuals who believe they have experienced an incident of harassment, discrimination or retaliation that they believe is contrary to CBS policies are strongly urged to report their complaints before the conduct becomes severe or

---

[24] See, i.e. *Lauren Lockwood v. CBS Radio Inc*., et al., (Kings County, Index No. 514650/2018, Filed July 2018)

pervasive . . . to: Your immediate supervisor. Your department head. Any senior manager of the business unit. The CBS Human Resources Department. The CBS OpenLine at 1-877-CBS-0888 . . . email: CBSOpenline@cbs.com . . . The CBS Chief Human Resources Officer."

130.    At all relevant times, Defendant CBS's complaint procedure(s) were useless, ineffective, ignored, and unenforced.

### CBS' HR ORGANIZATION WAS INEFFECTUAL, ILL EQUIPPED, AND COMPOUNDED THE RAMPANT DISCRIMINATORY PRACTICES AND SEXIST WORKPLACE CULTURE OF DEFENDANTS CBS

113.    Defendants CBS' Human Resources Director for CBS RADIO and CBS Sports Network Defendant MARION, was relegated to a staff of one HR manager, Plaintiff MUSIELLO, who was not trained nor permitted to properly conduct investigations into improper conduct.

114.    While Plaintiff MUSIELLO was required to and did conduct investigations relating to employee complaints involving HR policies, she was directed to report all such complaints to Defendant MARION and no one else without her approval

115.    CBS' HR Director, Defendant MARION engaged in the very discriminatory conduct she had a duty to prevent in the workplace. For example, Defendant MARION laughed at other Defendants CBS employees' sexual jokes and innuendos made to her or in front of her in the presence of female employees.

116.    At various times, Defendant MARION participated in Defendants CBS employees' gambling pools in violation of Defendants CBS's policies. For example, Marion participated and won the March Madness pool.

- 26 -

117.    At various times, Defendant MARION drank excessively and became intoxicated at Defendants CBS events in front of her colleagues. At one CBS employer event, CBS employees had to place her in an Uber to get her home safely.

118.    During Plaintiff MUSIELLO's employment, at a holiday party and/or work event, Defendant MARION was seen kissing "S.A.", a male General Sales Manager WFAN in Defendants CBS's office.

119.    During Plaintiff MUSIELLO's employment, it was known amongst employees Defendant MARION had romantic feelings for a particular male Digital Sales Manager, "K.L." who worked in the same office location as her and Plaintiff.

120.    In or about 2016, K.L. was laid off by Defendant CBS. Defendant MARION saw to it that "K.L.", her romantic interest, and upon information and belief a family relation to another CBS Manager, was given a much more generous severance package than other employees. Such conduct presents various conflicts of interest in violation of CBS' Code of Business Conduct.

### CBS HR ORGANIZATION and INVESTIGATIONS REPORTED TO CBS CORPORATION

113.    As an HR Manager, Plaintiff MUSIELLO participated in various HR investigations involving female employee complaints of supervisors' misconduct including, and in particular, male CBS Radio host Defendant TAYLOR.

114.    In or about 2016, Defendant CBS RADIO employed approximately 500 employees across six stations. Plaintiff MUSIELLO, along with her supervisor, Defendant

- 27 -

MARION, Director of HR, were responsible for *inter alia*, managing all HR needs for Defendant CBS RADIO's 500 employees during her employment.

115.    Given the limited resources allocated to its two-person HR department, Plaintiff MUSIELLO was overwhelmed with work, particularly in responding to employees and making decisions affecting their terms and conditions of employment.

116.    During her employment, Plaintiff MUSIELLO performed her duties in a satisfactory manner.

117.    At all relevant times, Plaintiff MUSIELLO was instructed to refer all critical questions or issues involving important decision making or legalities up to CBS Executive Management, CBS's Vice President of HR or CBS's In-House Legal Counsel. Plaintiff routinely received email communications, updates on policies and benefits from CBS "Corporate" as it was known or from "CBS.com" emails as well as "CBSRADIO.com."

118.    During Plaintiff MUSEILLO's employment, she witnessed Defendant MARION have regular contact by phone, email or in person meetings to consult with CBS Executives and obtain guidance and/or approval from CBS Executives regarding Defendant CBS CORPORATION's policies and decisions that directly affected Defendant CBS RADIO employees.

119.    In 2016, during Defendant CBS CORPORATION's company Farewell Party at 3 Sheets Saloon located at 143 W 4th Street, NY, NY, five payroll checks that were required to be distributed to employees at the event were lost or misplaced. As HR Manager, Plaintiff reported them missing. Prior to being voided, a number of the checks were cashed. Defendant CBS CORPORATION's Finance Department was informed of

- 28 -

this issue so that it could be handled internally and reissued checks to employees whose checks were already cashed.

120.     As HR Manager, Plaintiff MUSIELLO was aware Defendant CBS CORPORATION had the authority to hire, layoff or terminate any Defendant CBS RADIO employee and, CBS CORPORATION was, in fact, involved in decision making to terminate Defendant CBS RADIO's employees as part of approved layoffs, performance and/or termination policies, particularly, leading up to merger talks with Defendant ENTERCOM in late 2016 to early 2017. Although Defendant CBS CORPORATION announced the Merger on February 2, 2017, strategic layoffs had already begun in 2015 and continued in 2016 and 2017.

121.     At or about the time of the layoffs, reorganization and merger, there were communications between CBS parent and its subsidiaries regarding severance packages that were to be paid out. Although CBS Radio paid severance to laid off employees, CBS parent would rei, all of which is documented.

122.     In addition, in the normal course of payroll, CBS Radio would charge back CBS parent for employees who received monies for work performed for CBS. For example, if a CBS Radio employee did broadcast work, CBS reimbursed CBS Radio for this payroll expense, particularly for large payouts and any payments made under CBS Incentive or Executive Compensation plans including, and in particular, for example, employees, Kurt Laufer and Mark Mason. Such communications are documented in both company's records.

- 29 -

123.    In 2016, Plaintiff MUSIELLO received Defendant CBS CORPORATION's internal emails regarding newly implemented CBS policies and guidelines for internships that were employed by <u>all</u> Defendant CBS companies. Following alerts in the media regarding the illegality of unpaid internships, Defendants CBS Management reviewed and updated its policies to implement paid internships for for-profit employers in New York State.

124.    In 2015, Scott Herman ("Herman") became Defendant CBS RADIO's Chief Operations Officer (COO) with its office located at CBS Corporate Headquarters on 52nd Street, New York, New York.

125.    Like Defendant MARION, COO Herman's duties overlapped between Defendant CBS CORPORATION and Defendant CBS RADIO, including his leading of various CBS markets that overlapped radio, digital and television.

126.    On occasion, Plaintiff was required to and did request COO Herman's permission to approve certain payroll, overtime commissions or benefits for Defendant CBS RADIO employees.

**<u>WORKPLACE DISCRIMINATION WITNESSED BY PLAINTIFF MUSIELLO</u>**

127.    During Plaintiff MUSIELLO's employment, she witnessed various forms of widespread discriminatory treatment, for example, against employee "S.Z.", over age 60, who was forced out by Defendants CBS' Management.

128.    During Plaintiff MUSIELLO's employment, long time female employee "A.L." was terminated while eight months pregnant in December 2018, having worked for Defendants CBS for nearly 20 years.

- 30 -

129. During Plaintiff MUSIELLO's employment, a female employee "R.D." made a formal complaint against Marc Rayfield,

130. During Plaintiff MUSIELLO's employment, she witnessed discriminatory acts committed by Defendants against former employee, "B.N." a CBS Radio station manager. Employee B.N. suffered from a heart condition and required a medical leave of absence. At the end of his leave, B.N. notified Defendant CBS and its HR Department he was physically fit and able to resume his employment duties as per his doctor. Employee B.N. called Defendant CBS's office and left several voice messages. Plaintiff MUSIELLO forwarded his requests to return to work to Defendant MARION and advised Defendant MARION of the need to handle the employee's return to work. However, Defendant MARION ignored B.N.'s requests, and B.N. was ultimately not permitted to return to work for Defendants CBS.

131. At all relevant times, Plaintiff witnessed how Defendants' male employees were afforded more favorable treatment, compensation and pay scales in comparison to female counterparts as well as promotional opportunities.

132. Plaintiff MUSIELLO's male supervisors and coworkers, including, and in particular, sales team, radio personalities, department heads and management level employees, subjected female coworkers to sexual comments, outrageous sexual solicitations, unwelcome touching, innuendoes and hostility on a nearly daily basis. At various times, such behavior was conducted in the presence of Defendants CBS Management and HR, and still went unabated.

- 31 -

133.    During her employment, Plaintiff MUSIELLO was subject to CBS's corporate culture of permitting various forms of sex discrimination and sexual harassment in the form of sexual comments, innuendos, jokes and inappropriate touching from Defendants' male employees.

134.    As a Payroll Manager and as a victim of discrimination, she was faced with conflicts of interest and an inability to seek remediation or relief without fear of retaliation.

135.    While employed by Defendants CBS, Plaintiff MUSIELLO, along with her coworkers, were not afforded any meaningful sexual harassment and/or anti-discrimination, anti-retaliation and/or complaint procedure training.  Many CBS RADIO employees did not complete the online trainings administered by CBS CORPORATION, and yet, no action was taken by Defendant MARION or any CBS Executive to ensure completion of such trainings

### PLAINTIFF MUSIELLO'S PERSONAL EXPERIENCE OF SEXUAL HARASSMENT BY DEFENDANT DAN TAYLOR

113.    During her employment, Defendant TAYLOR, CBS RADIO's WCBS-FM Radio Network on air radio personality, began flirting with her. He often times stood at her desk and solicited her to engage in flirtatious banter. When she was not at her desk, he waited for her to return. On one occasion, Taylor propositioned Plaintiff MUSIELLO for lunch at PJ Charlton. During this conversation, Defendant TAYLOR told Plaintiff he knew she was up for a promotion, and, "that it would be in her best interest" to go because COO Scott Herman would be there as well.

- 32 -

114.    On various occasions, Defendant TAYLOR gifted Plaintiff chocolates, flowers, and sent her a handwritten card. Plaintiff rebuffed Defendant TAYLOR and refused to go to lunch with him.

115.    Defendant   TAYLOR's   advances   made   Plaintiff   feel   extremely uncomfortable, demeaned and disrespected.

116.    Despite Plaintiff's rebuffs, Defendant TAYLOR's pursuit continued. Plaintiff was left to handle Defendant TAYLOR'S sexual harassment on her own and was forced to tell Defendant TAYLOR to "back off."

117.    While Defendant TAYLOR was sexually harassing Plaintiff, she received complaints from other female employees that he was making sexual advances towards them as well, including soliciting them to join him in his private plane. While one female employee "D.G." turned him down, another employee, "J.D" joined him on a business trip and complained that he harassed her. Another female employee "J.L. was also sexually harassed by Taylor. He similarly solicited her to have a massage with him on a business trip.

118.    Defendant TAYLOR also sexually harassed his female news person, "D.R." who after rebuffing him, would fly over her house.

119.    Plaintiff MUSIELLO complained to Defendant MARION of TAYLOR's unwanted harassment of multiple female employees. However, Defendant MARION failed to properly investigate and/or take appropriate remedial action. In an attempt to minimize the misconduct, Defendant MARION finally sent an email to Defendant

- 33 -

TAYLOR advising him of Plaintiff's complaint and simply instructed Plaintiff MUSIELLO to stay away from Defendant TAYLOR.

120.    Plaintiff MUSIELLO's also complained to Controller Randall Friend, who reported directly to Stacey Benson, Defendant CBS CORPORATION's Senior Vice President of Finance. Friend had witnessed TAYLOR's constant lingering at Plaintiff's desk. Friend, who has since been terminated, expressed his disagreement over the manner in which Defendant MARION handled Defendant TAYLOR's inappropriate conduct.

## FURTHER EXAMPLES OF DISCRIMINATORY AND/OR ILLEGAL CONDUCT WITNESSED AND REPORTED BY PLAINTIFF

121.    During Plaintiff MUSIELLO's employment, Defendant TAYLOR made sexist comments about women in power to his male producer and made racist and bigoted remarks in general about "the blacks," "the Jews," "the Mexicans," and "the gays," calling them "fags." The producer who was gay was deeply offended and complained to HR. He was transferred from his position and no adverse action was taken against Taylor for any of the complaints made against him.

122.    During her employment as HR Manager, CBS employees met with Plaintiff MUSIELLO to address complaints from female employees concerning inappropriate sexual advances of other male executives, for example, COO Herman and Marc Rayfield SVP, CBS RADIO Market Manager. Herman would offer to take female sales employees out for what he referred to as "blow jobs" (and not blowouts) for their hair at a local hair salon, Dry Bar prior to concert events.

- 34 -

123. Despite the rampant complaints, Defendants CBS continued to take no remedial action and buried the female employees' complaints.

124. During Plaintiff MUSIELLO's employment, various employees complained of sexual harassment, and/or racism and/or bigotry by CBS Supervisor, Frank Iemmiti. For example, Iemmiti referred to a female employee as a "cunt," referenced "CPT" as "Colored People Time," referenced a male employee's "morning wood," and demonstrated the use of a vaginal mirror that was given out to employees at an event. He showed two female employees "J.D" and "Lauren" how they should use the mirror.

125. Defendant MARION's response to complaints from employees regarding Iemmiti's outrageous conduct was, "Deal with it." Once again, no proper investigation or remedial action was taken.

126. During Plaintiff MUSIELLO's employment, various female and male coworkers engaged in a consensual sexual relationship in violation of Defendants' HR policies and Business Code of Conduct.

127. In 2016, Plaintiff MUSIELLO walked in on a female and male employee having sex in a conference room in Defendant CBS's corporate office after work hours. When Plaintiff confronted them, the employees questioned her authority.

128. Plaintiff MUSIELLO escalated the matter to Defendant MARION who laughed it off and did not address the couple's inappropriate conduct or the employee's disrespect toward Plaintiff. MARION consistently undermined Plaintiff's authority and devalued her as an HR Manager for Defendants CBS.

- 35 -

129.    During her employment, Plaintiff MUSIELLO was directed by Defendant MARION to not follow Defendants CBS's HR policies regarding payroll and medical leave policies. For example, Defendant MARION directed Plaintiff to halt payroll for an employee who was approved for medical leave and not to fill out the employee's disability forms.

130.    During her employment, Defendant MARION instructed Plaintiff to ignore overtime sheets submitted by Defendants CBS's employees.

131.    During Plaintiff's employment, Defendants CBS consistently failed to pay overtime earned and owed to its employees CBS Radio 92.3 WBMP/WNOW promotion's department kept a "bank" of overtime hours worked and owed to employees. Rather than paying them time and a half, CBS Radio encouraged employees to take time off in lieu of compensation but was paid at straight hourly time.

132.    Defendants CBS consistently failed to pay overtime wages and paid no wages to interns employed by them.

### PLAINTIFF MUSIELLO'S HOSTILE WORK ENVIRONMENT, PHYSICAL AND EMOTIONAL DISTRESS, AND CONSTRUCTIVE DISCHARGE

113.    In or about December 2015, Plaintiff MUSIELLO injured her foot and was advised by her physician she needed to have surgery. She requested medical leave under Defendants CBS's leave policies.

114.    Defendant MARION refused Plaintiff MUSIELLO's initial request for medical leave despite submitting documentation of her physician's diagnosis. Defendant MARION refused to approve Plaintiff's medical leave. Plaintiff was forced to wait nearly

- 36 -

an entire year before finally approving her medical leave. As a result, Plaintiff's medical condition worsened, she required two surgeries back to back, and she eperienced medical complications relating to her foot prognosis and may need future surgery.

115.    During her medical leave, Plaintiff MUSIELLO was required to perform her duties and given additional work over and above the responsibilities of her position.

116.    Due to the extreme physical and emotional stress Plaintiff MUSIELLO was experiencing at work, Plaintiff, who was pregnant, began  experiencing pain indicative of a potential miscarriage. Plaintiff informed her supervisor, Randall Friend who instructed Plaintiff to go to the hospital.

117.    On October 28, 2015, Plaintiff was hospitalized. Shortly after, on October 30, 2015 Plaintiff MUSIELLO endured a miscarriage and resulting physical and emotional distress.  Despite her condition and hospitalization, Plaintiff was still required to work from home and complete payroll during the ordeal.

118.    Defendants CBS's hostile work environment directly interfered with Plaintiff MUSIELLO's ability to perform her job duties as an HR Manager and subjected her to both physical and psychological injuries and continuing fear of working in a corporate environment.

119.    As a result of Plaintiff MUSIELLO's inability to function in CBS' sexist, discriminatory hostile work environment, and the resulting emotional distress and health issues she suffered, Plaintiff was unable to return to Defendant CBS' employment following her medical leave. Her last date of employment was February 17, 2017.

**FIRST CAUSE(S) OF ACTION**

- 37 -

## Hostile Work Environment Based on Sex (NYSHRL and NYCHRL)

113.    Plaintiff MUSIELLO repeats and realleges the allegations contained in the above paragraphs as if set forth at length herein.

114.    At all relevant times, the sex discrimination and harassment that pervaded the workplaces of Defendant CBS CORPORATION and its wholly owned subsidiaries, Defendants CBS RADIO and CBS RADIO NETWORK was severe and pervasive.

115.    Defendants CBS by their successors, Executives, Managers, HR and employees knew or should have known about the unlawful sex discrimination and harassment its female employees were subjected to.

116.    Defendants, by their successors, Executives, Managers, HR and employees failed to remediate the above described unlawful discriminatory conduct its female employees were subjected to.

117.    The persistent, frequent and pervasive discriminatory conduct created a work atmosphere that was hostile, abusive, humiliating and degrading to Defendants CBS' female employees, including without limitation, Plaintiff.

118.    Defendants subjected Plaintiff to a hostile work environment permeated with harassment based on sex sufficiently severe and pervasive to alter the conditions of Plaintiff's employment, in violation of New York State Executive Law § 296 and New York City Administrative Code § 8-101, *et seq*.

119.    As a result of Defendants' hostile work environment, Plaintiff has suffered damages including, without limitation, deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, severe emotional

- 38 -

distress, personal injuries, pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

120. Defendants' violations were intentional and willful and done with a reckless indifference to the protections afforded to Plaintiff. Defendants' violations occurred under circumstances that warrant imposition of punitive damages.

## SECOND CAUSE(S) OF ACTION
### Sexual Harassment/ *Quid Pro Quo* (NYSHRL and NYCHRL)

113. Plaintiff MUSIELLO repeats and realleges the allegations contained in the above paragraphs as if set forth at length herein.

114. Defendants' aforesaid acts were committed in the course of their employment.

115. Plaintiff was unlawfully subjected to *quid pro quo* sexual harassment.

116. As a result of Plaintiff's rebuffs and complaints of Defendant Dan Taylor's sexual advances, she suffered an adverse impact to the terms and conditions of her employment in violation of New York State Executive Law § 296. and New York City Administrative Code § 8-101, *et seq*.

117. By reason of the Defendants' *quid pro quo* sexual harassment, Plaintiff MUSIELLO suffered damages including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, severe emotional distress, personal injuries, pain, suffering, mental anguish, humiliation and damage to reputation and career.

118. Defendants' acts were intentional, willful and done with a reckless

- 39 -

indifference to the legal protections afforded to Plaintiff to be free from sexual harassment and/or retaliation. Defendants' violations occurring under the aforementioned circumstances warrant imposition of punitive damages.

### THIRD CAUSE(S) OF ACTION
### Discrimination Based on Sex - Disparate Treatment (NYSHRL and NYCHRL)

113.    Plaintiff MUSIELLO repeats and realleges the allegations contained in the above paragraphs as if set forth at length herein.

114.    By reason of Defendants' aforementioned acts, Defendants discriminated against Plaintiff on account of her sex during her employment with Defendants CBS.

115.    Defendants discriminated against Plaintiff and/or other female employees based on their sex through their practices of hiring, promotion, training, compensation, and termination. Defendants failed to investigate their female employees' internal complaints of sexual harassment and policy violations, and/or retaliated against their female employees' for lodging such complaints by adversely affecting the terms and conditions of their employment with Defendants in violation of the NYS Executive Law § 296 and New York City Administrative Code § 8-101, *et seq*.

116.    As a result of Defendants' discriminatory and adverse acts, Plaintiff and other similarly situated employees have suffered damages including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, severe emotional distress, pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

117.    Defendants' violations were intentional and willful and done with a

- 40 -

reckless indifference to the protections afforded to Plaintiff. Defendants' violations occurring under the aforementioned circumstances warrant imposition of punitive damages.

## FOURTH CAUSE(S) OF ACTION
## Sex Discrimination – Disparate Impact (NYSHRL and NYCHRL)

118.     Plaintiff MUSIELLO repeats and realleges the allegations contained in the above paragraphs as if set forth at length herein.

119.     Defendants CBS maintained a pattern and practice of gender discrimination and bias against female employees with respect to the terms and conditions of their employment in violation of the NYS Executive Law § 296 and New York City Administrative Code § 8-101, *et seq*.

120.     Defendant CBS' facially neutral employment policies and practices, including, but not limited to, its Business Code Conduct, were ineffectually implemented so as to enable and compound the rampant discriminatory practices in hiring, training, promoting, compensating, fielding complaints, and terminating employees.

121.     The above described facially neutral but ineffectually implemented employment policies allowed for gender bias on the part of Defendants CBS' decision-makers and Human Resources representatives, whether intentional or unconscious, which was further enabled by the lack of any system or structure of meaningful oversight or accountability to field, investigate and remediate complaints and protect against such bias.

122.     The existence of the foregoing practices, standards, and/or policies is the

cause of an adverse effect on Defendants CBS' female employees, including and in particular, unequal pay at all levels of the corporate hierarchy for female employees. Plaintiff MUSIELLO and other similarly situated employees are victims of such disparate impact.

123. As a result of the above described disparate impact discrimination, Defendants CBS have treated Plaintiff MUSIELLO, along with other identified and unidentified female employees, less preferentially than similarly situated male employees.

124. As a result of the above described disparate impact discrimination by Defendants CBS, Plaintiff MUSIELLO and other similarly situated females have been deprived of income in the form of salary, bonuses, medical benefits, retirement benefits, and other employment benefits, and have suffered irreparable harm.

125. As direct and proximate result of Defendants CBS' unlawful disparate impact discrimination, Plaintiff MUSIELLO and other similarly situated females have and are now suffering irreparable injury and monetary damages, including, without limitation, lost wages, benefits and other perquisites of employment, emotional distress and pain and suffering.

### FIFTH CAUSE(S) OF ACTION
### Retaliation (NYSHRL and NYCHRL)

113. Plaintiff MUSIELLO repeats and realleges the allegations contained in the above paragraphs as if set forth at length herein.

114. By the aforementioned acts, Defendants were on notice that its practices

and procedures violated various federal, state, and/or local statutes and/or regulations.

115.    Plaintiff's rebuffs of Defendants' sexual harassment, complaints of a hostile work environment, of disparate treatment, and of discrimination based on sex, age, and disability against Plaintiff and other employees resulted in retaliatory action taken against her that culminated in a pretextual reason for her denial of medical leave in violation of New York State Executive Law § 296 and New York City Administrative Code § 8-101, *et seq*.

116.    As a result of Defendants' retaliation against her, Plaintiff suffered damages including, without limitation, deprivation of income and benefits, loss of opportunity for advancement and promotion, emotional pain, suffering, inconvenience, mental anguish, personal injuries, humiliation, and damage to reputation and career.

117.    Defendants' violations were intentional and willful and done with a reckless indifference to the protections afforded to Plaintiff. Defendants' violations occurring under the aforementioned circumstances warrant imposition of punitive damages.

### SIXTH CAUSE OF ACITON
### New York Labor Law ("N.Y.L.L.") §190

118.    Plaintiff MUSIELLO repeats and realleges the allegations contained in the above paragraphs as if set forth at length herein.

119.    By the acts complained of, Defendants were on notice that their failure to pay overtime wages violated various federal, state, and/or local statues and/or regulations, including, but not limited to, New York State Labor Laws, and in particular,

- 43 -

N.Y.L.L § 190.

120.  Plaintiff MUSIELLO's complaints of Defendants' violations resulted in retaliatory action taken against her culminating in her constructive termination in violation of NYS and NYC Labor Laws.

121.  As a result of Defendants' violation of New York Labor Law and retaliation for her complaints, Plaintiff has suffered damages including, without limitation, deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, severe emotional distress, personal injuries, pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

122.  Defendants' violations were intentional and willful and done with a reckless indifference to the protections afforded to Plaintiff. Defendants' violations occurring under the aforementioned circumstances warrant imposition of punitive damages.

**WHEREFORE,** Plaintiff JACQUELYN MUSIELLO respectfully requests that this Court grant judgment for her and others similarly situated and that it order and award her the following relief against the Defendants:

(1) Grant Plaintiff declaratory judgment that the acts, policies, practices and procedures complained of herein violated Plaintiff's rights and those female employees similarly situated as secured by the New York City Administrative Code, § 8-101, and

- 44 -

the New York State Executive Law § 296 and such other statutes that provide protection

against discrimination;

(2) Grant Plaintiff preliminary and permanent injunctions, prohibiting the

Defendants, their agents, successors, employees, and those acting in concert with them

and at their direction from engaging in any of the practices set forth above and any

other practice shown to be lawful or retaliatory or discriminatory on the basis of sex

with respect to compensation, terms, conditions and privileges of employment or from

continuing or maintaining a policy, practice, custom or usage of denying, abridging,

withholding, conditioning, limiting or otherwise interfering with the rights of Plaintiff

to enjoy equal employment opportunities secured by law;

(3) Establish a mechanism for the enforcement of the injunctions by requiring the

Defendants to present to the Court within 30 days of the issuance of the injunction, (a) a

plan showing precisely and in detail how they will comply with the Court's order and

that they cease and desist from policies, practices, customs and usages of discrimination

against Plaintiff and other persons similarly situated and (b) reimbursement for lost

bonuses, health benefits, 401K contributions, social security, experience, training

opportunities, and other benefits; in an amount to be proved at trial;

(4) Compensatory damages for emotional pain and suffering, mental anguish,

humiliation, loss of reputation and opportunity and permanent disability in an amount

to be proved at trial, but believed to exceed $10,000,000;

(5) Liquidated damages in an amount to be awarded at trial;

(6) Punitive damages in an amount to be awarded at trial;

- 45 -

(7) Attorneys' fees, costs and disbursements;

(8) Interest; and

(9) Such additional relief to Plaintiff as the Court deems just and proper.

Dated:  New York, New York
   February 14, 2020

          THE CLANCY LAW FIRM, P.C.
          *Attorneys for Plaintiff and other*
          *similarly situated employees*

     By: */s/ **Donna H. Clancy***
       Donna H. Clancy, Esq.
       40 Wall Street, 61st Floor
       New York, New York 10005
       (212) 747-1744

- 46 -

## **VERIFICATION**

**STATE OF NEW YORK** )

                          **ss.:**

**COUNTY OF NEW YORK** )

Donna H. Clancy, an attorney at law, duly admitted to practice in the Court of the State of New York, affirms under the penalties of perjury, that:

I am the founding attorney of The Clancy Law Firm, P.C., attorneys of record for Plaintiff JACQUELYN MUSIELLO.

I have read the foregoing VERIFIED COMPLAINT and know the contents thereof, and upon information and belief, I believe the matters alleged therein to be true.

The reason this verification is made by deponent and not by the Plaintiff is that the Plaintiff resides in a County and State other than the one in which the Plaintiff's attorneys maintain their office.

The source of deponent's information and the grounds for belief here are communications, papers, reports and investigations contained in the file.

- 47 -

Dated:  New York, New York
           February 14, 2020

THE CLANCY LAW FIRM, P.C.
*Attorneys for Plaintiff*

By:   /s/ ***Donna H. Clancy***

       Donna H. Clancy, Esq.
       40 Wall Street, 61st Floor
       New York, New York 10005
       (212) 747-1744

- 48 -